UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL K. McCARTHY, | ) | Case No. 3:07 CV 3051 |
| | ) | |
| Plaintiff, | ) | Judge  James G. Carr |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Daniel K. McCarthy seeks reversal of the decision of the Commissioner denying his application for disability insurance benefits.  McCarthy is a younger individual injured in an industrial accident when he suffered left knee injury and  right leg crushing injury on February 21, 2001. These injuries were followed by corrective surgeries and rehabilitative therapy.  McCarthy's application for benefits was denied by an ALJ on October 31, 2005, and the Appeals Council adopted this decision making it the final decision by the Commissioner. See 20 C.F.R. §404.981. The ALJ had found impairment due to degenerative joint disease of the left knee and right ankle, discogenic disorder of the lumbar spine, borderline intellectual functioning and depressive disorder. (Tr. 22). In this final decision, the ALJ concluded that McCarthy could not perform his past relevant work and could not perform the full extent of sedentary work.  The ALJ determined that McCarthy was not disabled  based on vocational expert testimony from the administrative hearing that someone with McCarthy's limitations could nonetheless work as a weight tester, call out operator and hand mounter, and that these jobs existed in significant numbers in the locality. (Tr. 23). McCarthy contends he is disabled under the social security regulations and challenges all aspects

2

of the Commissioner's decision, which led to this appeal under 42 U.S.C. §405(g).  This matter has been referred for report and recommended disposition.

*Standard of Review:*

The issues before this court must be resolved under the standard whether there is substantial evidence in the record to support the Commissioner's decision.  Substantial evidence is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Secretary*, 974 F.2d 680, 683 (6th Cir. 1992); *Born v. Secretary*, 923 F.2d 1168, 1173 (6th Cir. 1990); and see *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (court may "not inquire whether the record could support a decision the other way").

*Sequential Evaluation and Meeting or Equaling the Listing of Impairments:*

The Commissioner follows a 5-step review process known as the sequential evaluation. This evaluation begins with the question whether the claimant is engaged in substantial gainful activity and then at the second step whether there is a medically severe impairment.  See §404.1520(a)(4)(i) and (ii) and §416.920(a)(4)(i) & (ii). At the third step of a disability evaluation sequence the issue is whether the claimant has an impairment which meets or equals a listed impairment from the Listing of Impairments of Appendix 1.  See 20 C.F.R. §404.1520(a)(iii) and (d); §416.920(a)(iii) and (d).  If an impairment exists which meets the description from the listing or is its equivalent, the claimant is deemed disabled at that point without consideration of age, education or prior work experience. See *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291,

3

96 L.Ed.2d 119 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (Once a claimant has met this burden that ". . . his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without determination whether he can perform his prior work or other work.")."At the fourth step of the sequential approach described in 20 C.F.R. §404.1520, it is the claimant's burden to show that [he] is unable to perform [his] previous type of work." *Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 467, 2004 WL 2297874, at *3 (6th Cir. 2004)); *Studaway v. Sect'y of Health and Human Services*, 815 F.2d 1074, 1076 (6th Cir. 1987). Once the administrative decision-maker determines that an individual cannot perform past relevant work, then the burden of going forward shifts to the Commissioner at the fifth step to demonstrate the existence of types of employment compatible with the individual's disability. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Ellis v. Schweiker*, 739 F.2d 245 (6th Cir. 1984); *Cole v. Secretary*, 820 F.2d 768, 771 (6th Cir. 1987); *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

*Orthopaedic disability under a Listed Impairment:*

McCarthy's position has been that his industrial injuries met or equaled §1.06 of the Listing of Impairments.[1] (Tr. 428). The Commissioner, however, determined that McCarthy was able to ambulate effectively without the use of aids (Tr. 19). "Effective ambulation" is the common thread

---

[1] 1.06 Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. With:

A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.06.

4

running from §§1.02 and 1.03 governing weight-bearing joint dysfunction or surgical attempts to restore joint function, §1.04C governing lumbar spinal stenosis, §1.05 governing amputation, and §1.06 governing lower extremity bone fractures. The parties can quibble over whether or not solid unions are evident, but the bottom line is whether McCarthy can "ambulate effectively." [2]

The Commissioner argues that the record in this case is replete with documentation that McCarthy is capable of walking without ambulatory assistance. Two months after the accident on April 26, 2001, Dr. Thomas stated that McCarthy "is now walking without the walker which certainly looks a lot better to me" (Tr. 356, 382, 405). On May 24, 2001, Dr. Thomas reported that McCarthy was "now walking entirely without any assistive devices such as a cane or walker" (Tr. 355, 381, 404). On July 26, 2001, Dr. Thomas advised that McCarthy walk as much as possible to restore his muscle tone (Tr. 352, 378, 401). On September 10, 2001, Dr. Thomas reported that McCarthy "walks with a normal gait pattern now or at least a sort of wobbling gait pattern but he

---

[2]   What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00B(2)(b)

5

does not need anymore (*sic*) assistive device such as canes or crutches" (Tr. 350, 376, 399). On September 27, 2001, Dr. Thomas stated that McCarthy "is no longer using any type of assistive devices to walk" (Tr. 349, 375, 398). On December 12, 2001, Dr. Thomas reported that McCarthy "is walking without any type of assistive devices" (Tr. 348, 397).  On December 21, 2001, Dr. Thomas noted that McCarthy had returned to work and was complaining of left leg pain. (Tr. 396). [3]  McCarthy counters with his testimony that when he shops he always hold onto the cart (Tr. 438-39), and that he reportedly limped during exams and was prescribed a leg brace (Tr. 201, 253, 255). McCarthy also seeks to equate his leg brace as an assistive device.

The ALJ found this testimony to be exaggerated (Tr. 19). Further, the ALJ noted there was an absence of medical evidence from treating sources or the state agency to support the claim that McCarthy could not ambulate effectively. (Tr. 19).  A residual functional capacity prepared by a non-examining state agency physician dated  August 12, 2002, concluded that McCarthy could stand/walk four hours of a work day, and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 180-81). This assessment was made subsequent to the functional assessment dated September 18, 2001, from the rehabilitative therapist, who charted ability for "occasional" walking, stair climbing, stepladder climbing and balancing. (Tr. 176).

For McCarthy's impairments to be disabling, they must meet a 12-month durational requirement. See 42 U.S.C. §423(d)(1)(A); 20 C.F.R. §404.1520(b); 20 C.F.R. Part 404, Subpt. P,

---

[3] McCarthy returned to work from November 20, 2001 to January 10, 2002. (Tr. 95). The ALJ deemed this to be a failed work attempt. (Tr. 17).

6

App. 1, §1.00B2a (Listing of Impairments); and see *Barnhart v. Walton,* 535 U.S. 212, 219, 122 S.Ct. 1265, 1270, 152 L.Ed.2d 330 (2002)(Commissioner's interpretation of durational requirement of disability definition is reasonable).  The medical record provided substantial evidence to support the finding that   McCarthy regained the ability to effectively ambulate within 12 months of the accident.

Further the leg brace was not  a cane or crutches as addressed in the definition of effective ambulation. The burden to establish that a claimant meets or equals a listed impairment is upon the claimant, and in order to meet a listed impairment the claimant must meet <u>all</u> the requirements of a listed impairment.  *Hale v. Secretary*, 816 F.2d 1078, 1083 (6th Cir. 1987); *Land v. Secretary*, 814 F.2d 241, 244 (6th Cir. 1986); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990).

As for McCarthy's next argument concerning equivalency to this listed impairment, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment (emphasis in original)." *Sullivan*, 493 U.S. at 531; 110 S.Ct. at 891. Medical equivalence must be based upon medical findings and a qualified medical or psychological consultant designated to provide evidence of medical equivalence.  See 20 C.F.R. §404.1526(b) and (c) and §416.926(b) and (c).  This designated consultant's opinion presents a formidable obstacle because, " long standing policy requires that the

7

judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180 at *3.  Accordingly, the state agency physician reports provided substantial evidence to reject the assertion that McCarthy's degree of impairment was the equivalent to §1.06 of the listed impairments.

*Mental Disability under a Listed Impairment:*

McCarthy further contends that his impairments in combination met or equaled §12.05C.[4] Again, the burden to establish that a claimant meets or equals a listed impairment is upon the claimant.  *Land v. Secretary*, 814 F.2d 241, 244 (6th Cir. 1986); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

The ALJ rejected this argument finding no evidence of "significant adaptive deficits as required by the Listing." (Tr. 19).  McCarthy criticizes the ALJ's reliance on Dr. House's psychological examination, which indicated moderate impairment of activities of daily living, mild impairment of social functioning, and moderate impairment of concentration, persistence or pace. (Tr. 19). McCarthy contends that the ALJ confused §12.05C with §12.05D, which directly

---

[4] **12.05 Mental retardation**: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1

8

incorporates these "B-criteria."  However, "[a]daptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills. See *Heller v. Doe by Doe*, 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)." *West v. Comm'r Social Sec. Admin.*, 240 Fed.Appx. 692, 698, 2007 WL 1991059, *5 (6th Cir.2007). "In essence, then, a claimant must make three showings to satisfy Listing 12.05(C): (1) he experiences 'significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period' (i.e., the diagnostic description); (2) he has a 'valid verbal, performance, or full scale IQ of 60 through 70'; and (3) he suffers from 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.' *Id*. See also *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir.2001); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)." *West v. Comm'r Social Sec. Admin*. 240 Fed.Appx. at 697-698. The ALJ had not strayed from his mark when he discussed the "B-criteria" since these overlap activities of daily living and maintaining social functioning. [5]

---

[5] 1. Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
. . .

2. Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
20 C.F.R. Pt. 404, Subpt. P, App., §12.00C(1) &(2) (Effective 2005-June 15, 2008).

9

The ALJ , as in *West,* insisted on a greater degree of deficit in adaptive functioning. This ALJ required "significant" deficit and in *West*, the ALJ required "marked"deficit. See *West*, 240 Fed. Appx. at 698.[6]  Neither of these modifiers is present in the text of the regulation. Nonetheless, the burden remains on McCarthy and no evidence of deficit in adaptive functioning before age 22 was present. Dr. House reported that McCarthy, age 39 at that time in 2003, had been married 18 years, and that McCarthy, his wife and three children lived together (Tr. 222). He had dropped out of school at 16 and had a continuous series of jobs since 1983. (*Id.*, and Tr. 99). McCarthy drove and obtained a valid driver's licence, with an oral test because he is illiterate. (Tr. 222, 228). McCarthy reportedly cooked, cleaned, did some laundry, and grocery shopped with his wife. (Tr. 226).   Dr. House's testing produced a verbal I.Q. score of 66, which the doctor attributed to a learning disorder (Tr. 226-27) Performance I.Q. was 83 and full scale I.Q. was 72.[7]  Dr. House also commented that McCarthy was socially outgoing (Tr. 229).  In short, there is no evidence of a deficit in social skills, communication, and daily living skills extant before McCarthy became 22. The ALJ had substantial evidence to reject the claim that McCarthy's mental impairments met §12.05.

---

[6]  The Commissioner argues that the regulatory language tracks DSM-IV-TR, which states,  "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B)."  American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, pg. 41, 49 (Fourth ed. Rev.  2000)("DSM-IV-TR").  It is certainly reasonable to read the definition with the modifier "significantly" carrying over to adaptive functioning, although the regulation does not restate "significant" in relation to "deficits in adaptive functioning."  The regulation should be read with the intent to track the approved psychiatric definition. See *Sparks v. Astrue*, 2008 WL 4279999, 3 (E.D. Ky); *Sattler v. Commissioner of Social Sec.*, 2008 WL 2115256, 7 n. 1 (E.D. Mich). To do otherwise would create  an agency standard requiring a lesser degree of medical evidence to establish mental retardation than is used professionally to diagnose this impairment.

[7]  The lowest of these scores is used in conjunction with listing 12.05.See 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00D(6)(c);  *Abbott v. Sullivan,*  905 F.2d 918, 925 (6th Cir.1990).

10

McCarthy cites *Brown v. Secretary of Health and Human Services,* 948 F.2d 268 (6th Cir.1991) in support of his argument. *Brown* essentially held that the ability to perform the adaptive activities of daily living is no basis for rejection of a low I.Q. score. [8] The ALJ, though, did not reject the I.Q. scores reported by Dr. House. (Tr. 19). Consistent with *Brown*, the ALJ accepted the low I.Q. scores.

*Brown* does not aid McCarthy. *Brown* distinguishes deficits in adaptive functioning from low I.Q. McCarthy must still produce evidence of both current low I.Q. and prior deficits in adaptive functioning before age 22. See *West*, 240 Fed. Appx. at 698. If *Brown* had been decided the other way, then evidence of low I.Q. would equate with evidence of deficit of adaptive functioning. However, *Brown*, consistent with §12.00C (1) and (2) from the Listing of Impairments of Appendix 1, separates daily activities from low I.Q., and consistent with *Brown* the ALJ found both low I.Q. and the record established that there were no deficits in adaptive functioning manifested during the developmental period.

With respect to equivalency, "a finding of equivalence under Listing 12.05(C) will ''very rarely be required.' *Riley v. Apfel*, No. 97-1799, 1998 WL 553151, at *5 (6th Cir. Aug.20, 1998) (unpublished table decision) (quoting Social Security Programs Operations Manual

---

[8] "Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at a grocery store; he can do his own laundry and clean his room; he completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove. We do not deem these facts to be inconsistent with a valid test I.Q. of 68, and the Secretary offers no empirical evidence in support of this conclusion.(footnotes omitted)."

*Brown*, 948 F.2d at 269-270.

11

DI24515.056DIC).” *Foster,* 279 F.3d at 355. Specifically in regard to mental impairment, 20 C.F.R.§404.1520a requires rating the degree of functional limitation in accordance with the prescribed psychiatric review technique (PRT). The primary purpose of the PRT is to assess whether or not a claimant's mental restrictions meet or equal the listing of impairments. 20 C.F.R. §404.1520a(c)(3) incorporates assessment of severity as described under §12.00C of the Listing of Impairments of Appendix 1. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00C. The assessment conducted by the state agency psychologist (Tr. 231-239) provided substantial evidence for the ALJ's finding that the combination of mental disorders was not equivalent to a listed mental impairment.

*Residual functional capacity and need of accommodation:*

The ALJ found that McCarthy was restricted to less than the full range of sedentary work physically and was further nonexertionally limited to simple, routine, repetitive tasks. (Tr. 22). McCarthy does not challenge these limitations but wishes to add a restriction for the need to elevate one or both of his legs to relieve pain and swelling. (Tr. 450-51). McCarthy testified that he needs to elevate his leg 75% of the time (Tr. 451), and the vocational expert responded that this additional restriction would render McCarthy disabled. (*Id.*). If the residual functional capacity provided in the hypothetical question was incomplete due to the need for additional accommodation by leg elevation, reversal would be required under these circumstances. See. *Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987); compare *McCormick v. Secretary of Health and Human Servs.*, 861 F.2d 998, 1002 (6th Cir. 1988) (vocational expert included consideration of claimant's need to elevate her leg). The ALJ rejected this restriction stating McCarthy was exaggerating, there was no objective

12

evidence to show that McCarthy must elevate his right leg, such as edema, McCarthy cleaned and went shopping, and  there was no evidence from McCarthy's physicians about a need for leg elevation.  (Tr. 19-20).

The abilities to clean and shop bear little relevance to the question whether McCarthy requires leg elevation.  McCarthy further counters with citation to medical reports which he contends establish that there was edema which contradicts the ALJ's statement. (See Tr. 195, 196, 200, 256, 267, 268, 274, 276, 346).  However, he cannot produce a medical statement from the record of the need for leg elevation. This type of situation was addressed in *Martin v. Sect'y of Health and Human Servs.* , 805 F.2d 1035, 1986 WL 18075 (6th Cir. Oct. 23, 1986), where the absence of corroboration from physicians and "the relative absence of objective medical evidence" to explain claimant's pain, provided substantial evidence to reject the alleged need for leg elevation.

McCarthy's claim of persistent edema while seated is not supported by this record. Following surgery in July 2001, on August 6, 2001,  Dr. Frogameni noted McCarthy's complaint of right ankle swelling, noted mild tenderness of the distal fibula from swelling, but no evidence of instability. (Tr. 276). On October 17, 2001, Dr. Frogameni reported that McCarthy was not experiencing swelling (Tr. 274). Several months later while McCarthy was attempting to return to work, Dr. Thomas noted on December 20, 2001 and January 9, 2002, that McCarthy had "swelling" and prescribed support stockings (Tr. 346, 347). The doctor diagnosed probable stasis dermatitis affecting the left lower extremity and related that he told McCarthy, "he really needs to wear those

13

stocking[s] more often especially if he is sitting around." (Tr. 347). This episode of swelling, though, was from *standing*, Dr. Thomas remarked " the longer he is on his feet the more swelling he seems to get in his left foot." (Tr. 347). This contradicts McCarthy's alleged need for foot elevation while seated. Later, Dr. Padanilam noted right ankle swelling on June 19, 2002 (Tr. 267). At that time additional surgery was discussed and on August 20, 2002, arthroscopic right ankle surgery was performed. (Tr. 264). Following surgery, no swelling was noted and McCarthy stated the ankle problem was 90% better (Tr. 263). McCarthy's citation to the record also included references to minimal "effusion" in the left knee, not edema. (Tr. 195, 196, 200, 256, 257, 268, 274). Dr. Frogameni noted on July 22, 2002, that after taking Vioxx there was no effusion (Tr. 265).

From this record, the ALJ was confronted by a situation where there was little objective evidence to corroborate McCarthy's alleged pain, a need for leg elevation to alleviate this pain and there is an absence of corroboration from physicians with regard to the need for leg elevation. As in *Martin*, the ALJ had substantial evidence to reject McCarthy's credibility relating to the alleged need for this additional restriction.

*Significant Number of Jobs:*

The vocational expert testified that there were a total of 820 positions existing for the jobs of weight tester (170), call out operator (250) and hand mounter (400), which existed within the parameters of less than sedentary work capability and were simple, routine, repetitive tasks for someone with McCarthy's education and past relevant work experience. (Tr. 23, 442). Under 42 U.S.C. §423(d)(2)(A) and its implementing regulation, 20 C.F.R. §404.1566, work which exists in

14

the national economy is work which exists in significant numbers either in the region where the applicant lives or in several regions of the country. See 20 C.F.R. §404.1566(a). There is precedent that a mere 125 jobs existing locally constitutes a "significant number" of jobs. See *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999), citing *Stewart v. Sullivan*, Case No. 89-6242, 1990 WL 75248 at *4 (6th Cir. 1990) (125 jobs in the local geographic area).

McCarthy points out that the vocational expert did not tally the number of jobs on a statewide or national basis as is customary. The Commissioner argues that the vocational expert would have certainly cited a greater number of jobs if the job numbers statewide and nationally were identified. While it certainly is common for the vocational expert to identify the number of jobs on statewide and national bases, this departure from "custom" did not result in error.

The term "national economy" has been defined by Congress as "work which exists in significant numbers in the region where such individual lives or in several regions of the country." See 42 U.S.C. §423(d)(2)(A). Naturally, there is some history to this definition. Prior to amendment in 1967, federal courts interpreted the Social Security Act as requiring evidence that there were a significant number of jobs "available in the general area in which [claimant] resides." See *Newman v. Gardner*, 376 F.2d 25, 26 (6th Cir. 1967); *Massey v. Celebrezze*, 345 F.2d 146, 153-56 (6th Cir. 1965); *Butler v. Flemming*, 288 F.2d 591, 595 (5th Cir. 1961). The Fifth Circuit, though, developed a more expansive view of "area" explaining, "In making this determination [the ALJ] must, of course, consider the matter of reasonable availability of jobs within the *geographical areas* which the claimant would normally be expected to consider if regularly in the labor market

15

(emphasis supplied)." *Celebrezze v. Kelly*, 331 F.2d 981, 982 (5th Cir. 1964). The inclusion of jobs available outside claimant's immediate community or "area" began to factor into the analysis of whether a significant number of jobs was available in that circuit. In contrast the Sixth Circuit's decision in *Massey*, emphasized that the vocational expert had expressed concern that other work the claimant could perform, "might necessitate moving from this area," and ultimately affirmed award of disability insurance benefits. *Masse*y, 345 F.2d at 153, 158.   Against these conflicting interpretations of the Social Security Act, the Commissioner's predecessor, the Secretary of Health, Education and Welfare, was arguing for an approach based on, "jobs which exist 'generally in the United States,' or jobs that 'are generally available through the United States.'" See *Massey*, 345 F.2d at 154.


Congress apparently was receptive to the "geographical areas" concept, and in 1967 added 42 U.S.C. §423(d)(2)(A) to make two significant changes in the disability benefit process.  First, the amendment imposed the "national economy" standard, and second, changed the analysis from job "availability" to job "existence."  See P.L. 90-248, §158(e), 81 Stat. 821 (effective January 2, 1968). As a result, the "area" of employment broadened to "...work which exists in significant numbers *either* in the region where such individual lives *or* in several regions of the country (emphasis in original)."  *Harmon v. Apfel*, 168 F.2d 289, 292 (6th Cir. 1999).   Subsequent to the statutory changes, regulations were enacted in the Code to incorporate the new standard for geographical area. See 20 C.F.R. §404.1560(c); §416.950(c); §404.1566(a)&(b) and §416.966(a)&(b).[9]

---

[9]  20 C.F.R. §§404.1560(c) and 416.960(c) provide:

We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education and work experience.  Any other work (jobs) that you

16

The vocational expert in this matter testified form the standpoint of McCarthy's locality when he identified 820 jobs and these numbers clearly constituted work which exists in significant numbers in the region where the applicant lives consistent with 20 C.F.R. §404.1566(a). Testimony concerning other geographic areas of the nation is merely an alternative ground for identifying substantial numbers of jobs, although such testimony is commonly provided at administrative hearings.

*Vocational expert's departure from the Dictionary of Occupational Titles:*

McCarthy contends that the 400 jobs identified by the vocational expert as existing for "hand mounter" should be stricken because the vocational expert's testimony did not conform to the Dictionary of Occupational Titles' job description and code number. McCarthy next refers to the positions of call out operator and weight tester.  A call out operator compiles credit card information.

---

can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

20 C.F.R. §§404.1566 and 416.966 provide:

(a) General.  We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.  It does not matter whether --

    (1) Work exists in the immediate area in which you live;

    (2) A specific job vacancy exists for you; or

    (3) You would be hired if you applied for work.

(b) *How we determine the existence of work.*  Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.  Isolated jobs that exist only in very limited numbers in relatively new locations outside of the region where you live are not considered 'work which exists in the national economy.'

(Tr. 421).  A weight tester takes readings and calculates the percentage of variation in the weight material using a formula or chart.(Tr. 422).  McCarthy is correct that these jobs, as described in the *Dictionary of Occupational Titles* are not suitable for an illiterate individual.

The Commissioner argues that  inconsistency with the *Dictionary of Occupational Titles* requires contemporaneous objection to give the expert the opportunity to clarify or rectify the error at the hearing.  Once the hearing has concluded, the ALJ may rely on nonconforming testimony.  "[T]he  ALJ was within his rights to rely solely on the vocational expert's testimony.  The social security regulations do not require the Secretary [now Commissioner] or the expert to rely on classifications in the Dictionary of Occupational Titles.   20 C.F.R. §404.1566(d)." *Conn v. Secretary*, 51 F.3d 607,610 (6th Cir. 1995).

However, McCarthy's grievance is not simply over inconsistency between the vocational expert's testimony and the *Dictionary of Occupational Titles*.  The vocational expert compiled a schedule of McCarthy's prior employment and categorized these positions by *Dictionary of Occupational Titles'* identifying numbers noting that these jobs were performed as unskilled work, except for janitor which was semi-skilled. (Tr. 148-49, 425, 440-41). The ALJ asked the vocational expert to consider someone with "the same age, education and work background as the claimant." (Tr. 442). McCarthy's education does not appear in the vocational expert's schedule. In fact the space in the vocational expert's  schedule where the expert was to fill in "education" was left blank. (Tr. 148).  At the hearing McCarthy testified that he completed the 9th grade and went into the 10th grade in special education classes. (Tr. 435).

18

Regardless of educational level, the ALJ found that McCarthy was "illiterate" referring to 20 C.F.R. §404.1564. (Tr. 23).[10]  The vocational expert's testimony was based on the  "same education" and not illiteracy. So it appears that the inconsistency was due to a 9th grade education factored into the vocational expert's assumptions. What is clear is that the vocational expert's testimony did not factor in the ALJ's finding of "illiteracy."  Thus, the departure from the *Dictionary of Occupational Titles* was due to an incomplete hypothetical to the vocational expert and not merely a difference of vocational opinion or an error on the part of the vocational expert.

At the final step of sequential analysis, the ALJ is required to "tak[e] into consideration present job qualifications such as age, experience, education and physical capacity," to determine whether those jobs match claimant's qualifications, so that the claimant retains the capacity to perform a different kind of job. See *Maziarz v. Secretary of Health & Human Services,* 837 F.2d 240, 244 (6th Cir. 1987); and see 42 U.S.C. § 423(d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983); *Howard v. Commissioner*, 276 F.3d 235, 238 (6th Cir. 2002). "There must be 'a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs.'" *Shelman v. Heckler*, 821 F.2d 316, 320 (6th Cir. 1987). quoting *O'Banner v. Secretary*, 587 F.2d 321, 323 (6th Cir. 1978).  The burden of proof rests with the Commissioner at this step. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

---

[10] "The regulations define illiteracy as 'the inability to read or write.' 20 C.F.R. § 404.1564(b)(1). A claimant is considered illiterate 'if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.' *Id.* "Generally, an illiterate person has had little or no formal schooling.' *Id.*"

*Bell v. Barnhart*  148 Fed.Appx. 277, 283, 2005 WL 2175918, 5 (6th Cir. 2005).

19

The ALJ's decision lacks a finding supported by substantial evidence that McCarthy has the vocational qualifications to perform all jobs identified by the vocational expert because the expert was not asked to include illiteracy, the education level ascribed to McCarthy by the ALJ. This obviously eliminates the jobs of call out operator and weight tester and also eliminates the vocational expert's erroneous testimony concerning "hand mounter" since this position was also selected based upon incomplete consideration of McCarthy's educational background.

*Remand of New Evidence:*

McCarthy acknowledges that several exhibits were sent for consideration by the Appeals Council but he declines to request a sixth sentence remand under 42 U.S.C. §405(g). He contends that these exhibits were sent 9 months before the administrative hearing but were never placed into the record. McCarthy argues to extrapolate from *Hollon ex re. Hollon  v. Commissioner*, 447 F.3d 477 (6th Cir. 2006), a rule allowing bypass of the remand procedure required. *Hollon* is a ruling on remand due to a lost record, but enforced the requirements of a sixth sentence remand and did not create a new rule for lost evidence, stating:

> Hollon's argument on this point, however, is at odds with both the express language of § 405(g) and the practical realities of a sentence six remand for the consideration of new evidence. As discussed earlier, the statute specifically enumerates the requirements for a remand of the sort sought by Hollon: a court may order such a remand " only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (emphasis added). The fact that another party-the Commissioner-has met the prerequisites for a different sort of remand-under the first portion of sentence six-does not overcome the statutory command of both "good cause" and "new and material evidence" as required grounds for a sentence six remand for the consideration of additional evidence.

*Hollon ex rel. Hollon v. Commissioner of Social Sec.*  447 F.3d at 485.

20

Accordingly, this court first cannot circumvent the prohibition against the inclusion of new evidence into judicial review.  See *Cotton v. Secretary*, 2 F.3d 692, 695-96 (6th Cir. 1993); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *Cline v. Commissioner*, 96 F.3d 146, 148-49 (6th Cir. 1996). Second, without a demonstration of "good cause," new evidence and materiality, this court has no foundation to order a sixth sentence remand. Consequently, McCarthy cannot achieve his goal by obstinance despite some unfortunate unfairness due to the missing evidence. Of course this has no bearing on remand under the fourth sentence of 42 U.S.C. §405(g).

*Fourth Sentence Remand:*

Congress has authorized remand to the Commissioner under the fourth sentence where the district court does not retain jurisdiction even though new evidence may be considered. See *Faucher v. Secretary of HHS*, 17 F.3d 171, 174-75 (6th Cir. 1994), citing *Sullivan v. Hudson*, 490 U.S. 877, 880, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989). Generally, when the Commissioner misapplies the regulations or when one of the ALJ's factual findings is not supported by substantial evidence, recourse is through a remand under sentence four.  *Faucher*, 17 F.3d at 175-76. However, the Commissioner's decision may be reversed and benefits awarded only when the Commissioner's decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking.  *Newkirk v. Shalala*, 25 F.3d 316 (6th Cir. 1994); *Faucher v. Secretary*, 17 F.3d at 176;  *Mowery v. Heckler*,  771 F.2d 966, 973 (6th Cir. 1985); and see *Lashley v. Secretary*, 708 F.2d 1049 (6th Cir. 1983).

21

There is some precedent for remanding matters to allow the ALJ to obtain the missing explanation from the vocational expert where apparent conflict exists between the *Dictionary of Occupational Titles* and the jobs identified by the vocational expert. See *Whitzell v. Barnhart*, 379 F.Supp 2d 204, 219 (D.Mass.2005); *Carter v. Barnhart*, 2005 WL 3263936 (D.Me.2005); *Estrada v. Barnhart* 417 F.Supp.2d 1299, 1303 (M.D. Fla. 2006). However as explained above, the lack of substantial evidence supporting the denial of evidence is due to error which can be only attributed to the ALJ and goes beyond a mere conflict or difference of vocational opinion.

McCarthy has established with the *Dictionary of Occupational Titles*'s descriptions of the jobs of call out operator and weight tester, that literacy is required (Tr. 421, 422). McCarthy, though provided a copy of the definition of focuser, which is linked to the number (725.687-018) given in the vocational expert's testimony (See Tr. 420, 442).The description of focuser is as follows:

**725.687-018 FOCUSER (light. fix.)**

Observes magnified shadow of lamp filament projected on coordinate lines of dark screen to determine if coil has been properly centered within bulb. Pulls stem to center filament, using tweezers.

**GOE: 06.03.02 STRENGTH: S GED: R2 M1 L2 SVP: 3 DLU: 77**

Source www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT078.htm

The coded requirements indicate that this job is sedentary, but has an L2 language requirement which corresponds with reading novels, magazines, atlases and encyclopedias and

writing reports and essays with proper format, punctuation, spelling, and grammar. See *DOT*

Appendix C. Again this describes a job requiring more than fundamental literacy, let alone illiteracy.

The undersigned, though, has taken judicial notice of the *Dictionary of Occupational Titles,*

and uncovered two alternatives, one of which would have been the vocational expert's intended

target:

**725.684-014 MOUNTER, HAND (light. fix.)**
    Mounts tungsten filament coils on bead mounts or stems used in incandescent lamps by either of following methods: (1) Positions hooked ends of pair of stem lead wires on bed of press, slips filament coil ends under hooks with tweezers, and presses pedal to lower die on stem that clamps hooks over ends of coil. May clamp tungsten filament coil to lead wires which have no end hooks. (2) Slips one end of filament coil through lead wire hook of bead mount, using tweezers and magnifying glass, and clamps part in place, using press. Twists filament through loop in bead-mount anchor wire, through tip of other lead wire, and clamps part in place, using press. Pulls tip of anchor wire to tighten loop around filament coil, using tweezers. Inserts two completed mounts in each light bulb.

    **GOE: 06.04.23 STRENGTH: L GED: R2 M2 L2 SVP: 3 DLU: 77**

**725.684-018 STEM MOUNTER (light. fix.)**
    Fastens tungsten wire (filament) to glass stem to form mount for electric light bulb: Loops wire over hooks on glass stem held in revolving table and clinches hooks in place, using pliers. Cements ends to lead wires, using brush and carbon cement.

    **GOE: 06.04.23 STRENGTH: S GED: R2 M1 L1 SVP: 2 DLU: 77**

    Source www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT078.htm

The coded descriptions indicates that "mounter, hand" is light work and again carries the L2

language designation. However, stem mounter is designated as sedentary work and its numerical

identification is only one digit off from the number given by the vocational expert. It also has an

SVP (Specific Vocational Preparation) rating of 2, consistent with the vocational expert's testimony

(See   Tr. 442-43). While stem mounter is intellectually less demanding, its coded description indicates: math ability to add, subtract, multiply and divide; reading ability to read at the rate of 95-120 words per minute; and writing ability to print simple sentences and addresses. See *DOT* Appendix C. As the vocational expert testified these functions would be within the capacity of someone with McCarthy's 9th grade education in special education classes, but are not within the capabilities of an illiterate as defined under 20 C.F.R. §404.1566(b)(1). [11]

To repeat, the Commissioner bears the burden of proof at the fifth stage of sequential evaluation, and the jobs identified by the Commissioner in the adopted determination are not supported by substantial evidence that McCarthy has the vocational qualifications to perform the three specific jobs identified or an alternative to the vocational expert's mistake. The Commissioner's decision is clearly erroneous, proof of disability is overwhelming, and proof of disability is strong and evidence to the contrary is lacking.

The Commissioner also argues that remand for the purpose of allowing the vocational expert to identify additional jobs beyond the "sample" he provided at the hearing would not result in a different outcome in this case. Presumably though, the Commissioner's intent is that the vocational expert would provide more jobs than the "sample" the expert spoke of. (See Tr. 442), and three "examples" utilized by the ALJ (See Tr.  23). However, it was the ALJ's responsibility to gather

---

[11]   Whether the vocational expert intended "mounter, hand" or stem mounter, what is surprising is that there are 400 positions for hand-made light bulb manufacture in the Toledo, Ohio area. One would assume that in the 21st century, light bulb manufacture would have become more automated since the days of Thomas Edison.  Note: the DLU 77 code means "that the occupation has not been studied by an analyst since the publication of the fourth edition DOT in 1977." See *DOT* Appendix C.

24

substantial evidence to support the determination that McCarthy could perform other work which existed in significant numbers. The ALJ accepted the "sample" of three jobs and did not pump the vocational expert for more. Consequently, the Commissioner adopted a determination which carries with it both reversible error and is beyond redemption by remand for taking additional vocational evidence.


*Onset Date:*

The Commissioner states in his brief that because McCarthy filed a prior application for benefits which was denied by the state agency on August 23, 2002, the earliest date McCarthy is eligible for benefits is August 24, 2002. (Tr. 32, 46-49).  McCarthy concedes that he filed his first application for disability insurance benefits on June 17, 2002, which was denied on August 23 2002, and he did not appeal.  Instead he reapplied for benefits on December 12, 2002. (Tr. 53-55). The ALJ did not reopen the prior application, and a federal district court may not review the administrative refusal to reopen a prior application for benefits absent a colorable constitutional challenge.  See *Cottrell v. Sullivan*; 987 F.2d 342, 344-45 (6th Cir. 1992); *Harper v. Secretary of Health and Human Services*, 978 F.2d 260, 262 (6th Cir. 1992); *Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990); *Gosnell v. Califano*, 625 F.2d 744, 745 (6th Cir. 1980). An administrative decision on reopening does not require a hearing, and circuit precedent since *Gosnell*, has construed the language of §405(g) as limited only to confer jurisdiction over those matters which require an administrative hearing.

25

### *CONCLUSION AND RECOMMENDATION*

For the foregoing reasons based on the arguments presented, the record in this matter and applicable law, the undersigned finds that the Commissioner's decision denying disability insurance benefits was not supported by substantial evidence and should be reversed and remanded for the award and calculation of benefits.

s/James S. Gallas

United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).


Dated: January 21, 2009

26